IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CAITLIN THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:23-cv-00249 |
| v. | ) | |
| | ) | JUDGE CAMPBELL |
| WOODBURY VETERINARY HOSPITAL | ) | MAGISTRATE JUDGE NEWBERN |
| and COFFEE VETERINARY HOSPITAL, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the Court is a joint motion for summary judgment filed by Defendants Woodbury Veterinary Hospital and Coffee Veterinary Hospital (Doc. No. 44), and a motion for summary judgment filed by Plaintiff Caitlin Thompson. (Doc. No. 50). These motions are fully briefed. (*See* Doc. Nos. 44-2, 51, 55, 57, 58, 60, 61). As required by Local Rule 56.01, the parties each filed a statement of undisputed material facts (Doc. Nos. 44-1, 52) and response to the statements of fact (Doc. Nos. 56, 59).[1] For the reasons stated herein the motions for summary judgment will be denied.

## I.    BACKGROUND

Defendants Woodbury Veterinary Hospital ("Woodbury") and Coffee Veterinary Hospital ("Coffee") are small general practice animal hospitals. (Pl. SOF ¶ 31). Woodbury is owned by three partners – Dr. Hoover, Dr. Bruner, and Dr. Jordan. (*Id*. ¶ 29). Coffee is owned by Dr. Hoover

---

[1]    Defendants' Statement of Undisputed Material Facts (Doc. No. 44-1), together with Plaintiff's response (Doc. No. 56), is cited at "Def. SOF ¶ __" and Plaintiff's Statement Undisputed Material Facts (Doc. No. 52), together with Defendants' response (Doc. No. 56), is cited as "Pl. SOF ¶ __."

and Dr. Bruner. (*Id.*). Woodbury and Coffee are located in different towns – Woodbury, Tennessee and Manchester, Tennessee, respectively.

Plaintiff Caitlin Thompson worked for Woodbury as a veterinary technician from June 2020 to May 2021, and from December 2021 until she was terminated on December 3, 2022. (*Id.* ¶ 1). For three days in November 2022, Plaintiff worked at Coffee. (Pl. SOF ¶ 3, 23). This lawsuit arises out of events that took place during Plaintiff's brief employment at Coffee that led to the end of her employment at both Coffee and Woodbury.

Plaintiff was working for Woodbury when Dr. Bruner asked her if she would "consider helping out" at Coffee because it was understaffed. (Thompson Dep. at 48).[2] At the time, Plaintiff was only working Mondays at Woodbury. (*Id.* at 104). She voluntarily agreed to work at Coffee with the expectation that she would work there until Coffee found a replacement technician. (*Id.* at 48, 77). Plaintiff was the only employee to have worked at both Woodbury and Coffee. (Bruner Dep. at 28; Jordan Dep. at 23). At Coffee she was paid $2 more per hour than at Woodbury and allowed use of gas card to purchase approximately $55 of gasoline. (Def. SOF ¶¶ 23, 24, 46). Plaintiff claims her round-trip commute time to Coffee was approximately 10-15 minutes longer than her commute time to Woodbury.[3] (Def. SOF ¶¶ 2-5; Pl. SOF ¶ 26). Neither Plaintiff nor Defendants kept records of Plaintiff's commuting time, and Plaintiff neither reported the time nor requested to be paid for it. (Def. SOF ¶¶ 49, 61-65).

---

[2]     All deposition testimony is cited as "[Last Name] Dep. at [page number]." Deposition testimony is filed in the record as follows: Caitlin Thompson, Doc. Nos. 44-3, 50-4; Diane Bruner, Doc. No. 50-5; Michael Hoover, Doc. No. 50-6; Lewana Jordan, Doc. No. 50-3.

[3]     In her initial interrogatory responses, Plaintiff stated that her commute was approximate 40-45 minutes each way at both Woodbury and Coffee. (Def. SOF ¶¶ 47, 48). Plaintiff amended this response after "she had more time to think about the actual time it took [] to commute." (Thompson Dep. at 56). Plaintiff's amended response states that her commute was approximately 30-35 minutes each way to Woodbury and about 30-35 minutes to Coffee in the morning and approximately 40-45 minutes from Coffee in the afternoon.  (*See* Pl. Am. Interrog. Resp., Doc. No. 44-5 at PageID# 648-49).

Plaintiff worked for Coffee on three days, the last of which was November 29, 2022. Sometime that morning Dr. Hoover sent a text message to Dr. Bruner complaining that Plaintiff was "more screwed up" than another employee and that Plaintiff had misread some test results. (*See* Doc. No. 44-6). Dr Bruner responded, "Um well that's not ok." (*Id*.).

Later that morning, while Plaintiff was assisting Dr. Hoover with a blood draw for a dog named Luna, the dog was squirming, and they were having difficulty getting the blood draw. (Hoover Dep. at 30-31; Thompson Dep. at 43). Then, Dr. Hoover made contact with his hand to Luna's nose twice. (Pl. SOF ¶ 5). When describing the incident, Plaintiff testified that "Dr. Hoover got upset and struck [the dog] violently on the muzzle twice loud enough that you could hear it throughout the treatment room. And I know it caused her pain because she yelped as if she was in pain and urinated and defecated on herself, none of which is behavior you would expect from a dog who was not in pain." (Thompson Dep. at 43-44). Plaintiff cleaned the dog up and returned it to its owners. (Def. SOF ¶ 18).

Dr. Hoover does not dispute that he "made contact with his hand to Luna's nose twice," but he contends Plaintiff's characterization of the force of contact and Luna's reaction is inaccurate. (Def. Resp. to Pl. SOF ¶ 5; Hoover Dep. at 33-35, 41-42). Dr. Hoover described his contact with the dog's nose as a "tap" and testified that the dog did not defecate on herself. (Hoover Dep. at 33-35, 41-42). He did not remember whether the dog urinated on herself, but stated that if the dog had done so he would have written it in the record and suggested that the dog have mild sedation for future procedures. (*Id*.). He did not make any such entry in the record here. (*Id*.).

Plaintiff believed the conduct constituted animal abuse. (Thompson Dep. at 44 ("Regardless if there was a mark or not, he did strike her enough that [] she showed she was in pain and that is clearly abuse.")). She discussed her concerns about the alleged animal abuse with

3

Dr. Hoover after lunch that day. (Pl. SOF ¶ 13; Hoover Dep. at 70; Thompson Dep. at 76-77). Dr. Hoover responded by giving her two choices: "if she agreed [that there was no animal abuse], she could stay and work out the rest of her shift" or "if she didn't agree with that, she was free to go home." (Hoover Dep. at 70). Plaintiff left. (Pl. SOF ¶ 14). On her way home from the clinic, she spoke with Dr. Bruner and told her about what had happened. (Thompson Dep. at 130-31). By that time, Dr. Hoover had already notified Dr. Bruner of the incident by text. (Doc. No. 44-6). He wrote:

> caitlyn needs to go away … soon.
>
> …
>
> i had a dog this morning for heartworm test … she was holding it and dog was squirming and she kept letting go … i took dog and held it … she couldn't fucking get blood so i gave her back and i rapped her on the nose to get her attention … didn't strike her didn't do anything but tap her nose to get her attention … and she has a problem with it … i have a fucking problem with her saying a damn thing to me … if she could hold the damn dog we wouldn't have been there
>
> i'm done with her … tell her to go stick her fucking nose up Shirley's ass and get a fucking can of squeeze cheese …

(*Id*.).

On Saturday, December 3, 2022, during a phone call, Dr. Bruner fired Plaintiff from her job at Woodbury explaining, "If you can't work for one of us, you can't work for any of us." (Pl. SOF ¶ 16).

On December 5, 2022, Plaintiff collected two paychecks – one from Woodbury and one from Coffee – at the Woodbury clinic. (Pl. SOF ¶ 35). She also received a termination letter from Woodbury signed by Dr. Bruner and Dr. Jordan. (Pl. SOF ¶ 17; Doc. No. 50-1). The termination letter stated:

4

> Termination of Caitlin Thompson from Woodbury Veterinary Hospital was
> executed after an issue occurred at Coffee Veterinary Hospital, where as Mrs.
> Thompson stated she had some ethical issues with one of the owners there
> and walked out during her shift on November 29, 2022, the owner is also a
> partner here at Woodbury Veterinary Hospital. Due to that fact and after a
> conversation with Mrs. Thompson on December 3, 2022 she was terminated.

(Doc. No. 50-1). The parties agree the "ethical issues" referred to in the termination letter are Plaintiff's "claim that Dr. Hoover committed animal abuse toward Luna." (Pl. SOF ¶ 18). Dr. Bruner testified that Plaintiff was terminated "because she's accusing another employee of abuse and without any corroboration or anything, making it difficult to work with her after that when she's walking out on her job and accusing other employees of abuse and misconduct." (Def. Resp. to Pl. SOF ¶ 20; Bruner Dep. at 61-62). Dr. Bruner also testified that one of the reasons Plaintiff was fired from Woodbury was "not being able to perform the duties she was trained for" – "[h]olding and animal [and] drawing blood," which she stated was referring to the incident with Luna. (Bruner Dep. at 52).

After her employment ended, Plaintiff reported the incident and other concerns regarding Dr. Hoover to the Tennessee Board of Veterinary Medical Examiners. (Pl. SOF ¶ 21; Doc. No. 50-7). This lawsuit followed. (*See* Complaint, Doc. No. 1). Plaintiff brings claims for violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., and for retaliatory discharge under the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304. (*Id.*). An additional claim under 26 U.S.C. § 7434 related to tax forms was dismissed pursuant to a joint stipulation. (*See* Doc. No. 31, 32).

Now before the Court are the parties' cross motions for summary judgment. (Doc. Nos. 44, 50).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's claims. *Id.*

In evaluating a motion for summary judgment, the Court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich*., 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id*. The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence from which the jury could reasonably find for the nonmoving party. *Rodgers*, 344 F.3d at 595.

### III.    ANALYSIS

**A.    Fair Labor Standards Act**

Plaintiff claims Defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., by misclassifying her as an independent contractor, failing to maintain proper payroll records, and failing to compensate her for time traveling to and from Coffee that was in excess of her usual travel time to and from Woodbury. (*See* Doc. No. 51 at 20-22).

Of the three FLSA violations alleged, only the claim for unpaid wages is actionable under this section. "Although it is unlawful for an employer to fail to comply with [the FLSA's] recordkeeping requirements, the FLSA does not create a private cause of action for an employee against an employer for violation of recordkeeping provisions." *Stansbury v. Faulkner*, 443 F. Supp. 3d 918, 932 (W.D. Tenn. 2020) (citing *Elwell v. Univ. Hospitals Home Care Svcs*., 276 F.3d 832, 843 (6th Cir. 2002)). Similarly, although willfulness or negligence in misclassification is relevant to damages calculations, misclassification is not itself independently actionable. *Id*. at 933 (misclassification relevant to issue of liquidated damages). Accordingly, notwithstanding Defendants' alleged violation of various FLSA provisions, Plaintiff's actionable claim is that Defendants failed to compensate Plaintiff for all time worked at Coffee, specifically that Defendants failed to compensate her for travel time.

The FLSA provides for a private right of action against an employer by an employee when an employee has not been paid for compensable time. *See* 29 U.S.C. § 216(b). Generally, employers are liable under the FLSA only if they knew or could have known through the exercise of reasonable diligence that their employees performed work without compensation. *Craig v. Bridges Bros. Trucking, LLC*, 823 F.3d 382, 388-89 (6th Cir. 2016); *see also*, 29 C.F.R. § 785.12.

To establish a claim for unpaid compensation, Plaintiff must "prove by a preponderance of evidence that he or she performed work for which he [or she] was not properly compensated." *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 602 (6th Cir. 2009). When an employer keeps inaccurate or inadequate records, a plaintiff can estimate her damages and the burden shifts to the employer to negate the estimate. *Id.* at 602-03.

Generally, travel to and from home is not compensable work time. *See* 29 U.S.C. § 254 (employer is not subject to FLSA liability due to failure to pay an employee for "traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform"); 29 C.F.R. §§ 785.35 ("An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. This is true whether he works at a fixed location or at different job sites. Normal travel from home to work is not worktime.").

There are a few exceptions to this rule, including when an employee who regularly works at a fixed location is given an assignment in another city at the employer's "special request" and for its "benefit" to meet the needs of a "particular and unusual assignment." *See* 29 C.F.R. § 785.37 ("Home to work on a special one-day assignment in another city"). Under such circumstances, travel time to the secondary location is compensable "work," but only to the extent that it exceeds the time usually spent commuting to the regular work site. *Id.*

The parties agree Plaintiff is entitled to compensation for her travel time only if she was on "assignment" to Coffee at Woodbury's "special request" and her commute time to Coffee exceeded her commute time to Woodbury. At issue are: (1) whether Plaintiff was on "assignment" to Coffee from her regular workplace at Woodbury or was separately employed by Coffee; and (2)

8

whether Plaintiff's travel time to Coffee was more than her travel time to Woodbury and, if so, by how much.[4]

1. On Assignment or Separately Employed

Defendants argue that Coffee was a separate entity and separate employer that had no duty to compensate Plaintiff for travel time between her home and work because it was ordinary "Home to Work Travel Time." (Doc. No. 61 at 2 (citing 29 C.F.R. § 785.35)). In support of this argument, Defendants state that Plaintiff volunteered to take the job at Coffee and that Dr. Bruner testified that the offer to work at Coffee was "a separate job offer." (Def. SOF ¶ 25; Bruner Dep. at 56). Defendants argue that, although Coffee and Woodbury have owners in common, they are separate entities as evidenced by the fact that they have separate locations, names, and rates of pay; filed separate tax returns; and issued paychecks separately. (Pl. SOF ¶ 29; Def. SOF ¶¶ 23, 24; Compl. ¶¶ 6, 7; Jordan Dep. at 3; Doc. No. 50-9)).

Plaintiff contends she was on assignment from Woodbury because Dr. Bruner asked her to take a temporary assignment to Coffee to help relieve a staff shortage there. (Doc. No. 58 at 6 (citing Pl. SOF ¶ 25; Def. SOF ¶ 26; Answer, Doc. No. 20 ¶ 15; Thompson Dep. at 48; Bruner Dep. at 28, 56). Plaintiff argues that Woodbury and Coffee were joint employers or a joint enterprise for purposes of the FLSA, pointing to evidence that Woodbury and Coffee share common ownership and control (together Dr. Bruner and Dr. Hoover own 100% of Coffee and 66% of Woodbury), common purpose (both small general practice animal hospitals), and common

---

[4]    Defendants offer evidence to show that Plaintiff did not report her commuting time as hours worked or otherwise seek to obtain compensation for this time outside of this lawsuit. (*See* Def. SOF ¶¶ 60-67). But Defendants do not specifically argue that they did not know or have reason to know Plaintiff was commuting to Coffee or that her commute to Coffee was longer than her usual commute to Woodbury. (*See* Doc. No. 44-2 at 16-20). Indeed, the fact that Defendants provided Plaintiff a gas card in connection with her agreement to work at Coffee could be viewed as suggesting they knew she had additional driving time. (*See* Pl. Dep. at 61; Def. SOF ¶ 46).

control of Plaintiff's employment. (Doc. No. 58 at 10 (citing Pl. SOF ¶¶ 29-35; Def. SOF ¶¶ 37, 75-77). Plaintiff also notes that she retrieved her final paychecks from Woodbury and Coffee from the Woodbury location and both checks were signed by Dr. Bruner. (Pl. SOF ¶ 35; Doc. No. 50-9 (paychecks)).

The FLSA gives distinct meanings to the terms "employer" and "enterprise." *See* 29 C.F.R. § 779.203. As used in the FLSA, "enterprise" is "roughly descriptive of a business." *Id*. "Enterprise means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r)(1).

Whether a party is an employer within the meaning of the FLSA is a legal determination for which "economic reality" controls rather than common law concepts of agency. *Dole v. Elliot Travel & Tours, Inc*., 942 F.2d 962, 965 (6th Cir. 1991). "The FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA." *Id*. Under the economic reality test, the Court considers the "circumstances of the whole business activity," including "(1) whether the plaintiff is an integral part of the operations of the putative employer; (2) the extent of the plaintiff's economic dependence on the defendant[ ]; (3) the defendant's substantial control of the terms and conditions of the work of the plaintiff; (4) the defendant's authority to hire or fire the plaintiff; and (5) whether the defendant maintains the plaintiff's employment records and establishes the rate and method of payment." *Ellington v. City of E. Cleveland,* 689 F.3d 549, 555 (6th Cir. 2012) (internal citations omitted).

Neither party has shown an absence of dispute of material fact or that they are entitled to judgment as a matter of law on this issue. As an initial matter, Plaintiff has not pointed to any authority, and the Court has found none, using joint employer or enterprise status to determine whether an employee is "on assignment" to a different entity. When viewed in the light most

favorable to the non-moving party, the evidence presented is insufficient to establish as a matter of law that Plaintiff was or was not on temporary assignment to Coffee for the benefit of Woodbury. The matter is, of course, complicated by the fact that Dr. Bruner and Dr. Hoover are ostensibly Plaintiff's employers at both Woodbury and Coffee. But there is also evidence of Woodbury and Coffee's separateness – separate payroll, locations, names, etc. And the mere fact that the Coffee job was intended to be temporary does not require the conclusion that Plaintiff was on "assignment" from Woodbury; nor does the description "temporary assignment" necessarily mean that she was on "assignment" from Woodbury.

    2. <u>Travel Time</u>

Next, both parties contend there are no material disputes of fact concerning the difference in Plaintiff's commute. Defendants argue that even if Plaintiff was on a special assignment to Coffee or was required to travel there as an integral part of her job for Woodbury, she cannot meet her burden to show that she accrued compensable travel time because Plaintiff's testimony and interrogatory responses concerning her commute time are conflicting and insufficient to establish a violation of the FLSA for uncompensated travel time. (Doc. No. 44-2 at 16-20; Doc. No. 61 at 2-3). Plaintiff, on the other hand, argues that the evidence clearly shows that she is entitled to compensation for travel time based on her estimate that she spent an additional 10-15 minutes per day commuting to and from Coffee. Plaintiff argues that she does not need to prove every minute worked because Defendants failed to keep accurate records of her commute time and that her testimony is sufficient to approximate damages. (Doc. No. 51 at 21-22).

Neither party has shown an absence of material fact as to this issue. Taken in the light most favorable to Defendants, Plaintiff's commute was approximately the same, in which case she is not entitled to compensation for travel time. (*See* Pl. Resp. Interrogatories #10-11, Doc. No. 44-5

at PageID# 607-08)). However, Plaintiff later claimed that her travel time to Coffee was between 10 and 25 minutes more than her commute time to Woodbury. (*See* Pl. Am. Resp. Interrogatories # 10-11 at PageID# 648-49; Thompson Dep. at 63-65). A jury could credit this testimony and find she is entitled to compensation for travel (assuming they also conclude Plaintiff was on assignment from Woodbury). Accordingly, summary judgement will not be granted to either party on the FLSA claim.

**B.    Tennessee Public Protection Act**

The Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304(b), creates a cause of action for employees "discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." The TPPA "includes both (1) discharge in retaliation for refusing to *remain silent* about illegal activities, usually referred to as 'whistleblowing,' and (2) discharge in retaliation for refusing to *participate in* illegal activities. The claims are similar but distinct." *Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015) (emphasis in original) (citation omitted).

Where the claim is based on a refusal to remain silent about illegal activity, the plaintiff must establish that he or she reported the illegal activity and that the 'reporting of the illegal activity furthered a clear public policy.'" *Haynes v. Formac Stables, Inc*., 463 S.W.3d 34, 37 (Tenn. 2015). While the employee need not always report the suspected illegal activities directly to law or regulatory enforcement officials, they must make a report to someone other than the person or persons who are engaging in the allegedly illegal activities. *Haynes, Inc*., 463 S.W.3d at 40. In most cases, internal reporting will suffice. But when the wrongdoer is also the manager, owner, or highest authority within the company, the employee must report the alleged illegal activity to an outside entity. *Lawson v. Adams*, 338 S.W.3d 486, 493 (Tenn. Ct. App. 2010)

(citation omitted). When the claim is based on a refusal to participate in illegal activities, reporting is not required. *Haynes*, 463 S.W.3d at 37, n.3.

The TPPA defines "illegal activities" as "activities that are in violation of the criminal or civil code of [Tennessee] or the United States or any regulation intended to protect the public health, safety, or welfare." Tenn. Code Ann. § 50-1-304(a)(3). The Plaintiff need not prove an actual violation of law. "The [TPPA's] protection extends to employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated, and in good faith report it." *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997).

The TPPA sets a high bar for recovery for retaliatory discharge – the plaintiff must prove that retaliation for the protected conduct was the only reason for her termination. *See* Tenn Code Ann. § 50-1-304(b) ("No employee shall be discharged or terminated *solely* for refusing to participate in, or for refusing to remain silent about, illegal activities") (emphasis added); *Williams v. City of Burns*, 465 S.W.3d at 110-11 (Tenn. 2015).

The TPPA establishes a burden shifting framework similar to that used in federal employment cases. *Id*. § 50-1-304(f). Pursuant to this framework:

> [T]he plaintiff shall have the initial burden to establish a prima facie case of retaliatory discharge. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the plaintiff's discharge. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the plaintiff's discharge and that the stated reason was a pretext for unlawful retaliation. The foregoing allocations of burdens of proof shall apply at all stages of the proceedings, including motions for summary judgment. The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of unlawful retaliation.

*Id*. § 50-1-304(f).

13

Both parties move for summary judgment on this claim. Before proceeding to the substantive merits of Plaintiff's TPPA claim, the Court will briefly address several arguments raised by Defendants that are not directly tied to the merits. Defendants argue Plaintiff is not entitled to a jury trial on the TPPA claim, that the claim should be barred in its entirety under the doctrine of unclean hands (because Plaintiff literally cleaned the dog), and that Plaintiff's motion for summary judgment on the TPPA claim should be denied because of a host of procedural deficiencies, factual disputes, and unsupported facts.

Defendants contend Plaintiff is not entitled to a jury trial on the TPPA claim under the Tennessee Supreme Court's decision in *Young v. City of LaFollette*, 479 S.W.3d 785, 795 (Tenn. 2015). (*See* Doc. No. 44-2 at 13). But *Young* states only that a jury trial is precluded for claims brought in Tennessee circuit courts. *See* 479 S.W.3d at 794-95 ("By enacting the TPPA, but choosing not to provide explicitly for the right to trial by jury within the TPPA, the Legislature exercised its authority to effectively preclude the right to a jury trial, at least with respect to TPPA claims brought in circuit court."). The Court need not state the obvious distinction that this case was not brought in Tennessee circuit court. In any event, the Court agrees with Plaintiff that summary judgment is not the vehicle to decide whether the TPPA claim will be decided by the Court or a jury. Even if the Court were inclined to do so, the briefing on this issue, which consists of two paragraphs and only one published decision, is insufficient for the Court to resolve the issue at this juncture. (*See* Doc. No. 44-2 at 13, n.1; Doc. No. 58 at 11, n. 3; Doc. No. 61 at 4-5).

With regard to Defendants' arguments concerning alleged procedural and factual errors and deficiencies, as discussed below, disputes of material fact preclude summary judgment to any party on the TPPA claim. Accordingly, except as otherwise discussed herein, the Court does not address the arguments. Finally, the defense of unclean hands, even if not raised in jest, has no

14

application to Plaintiff's statutory TPPA claim.[5] *See In re Mattie L.*, 618 S.W.3d 335, 344-45 (Tenn. 2021) (holding a trial court erred in applying the doctrine of unclean hands as a defense to a claim for statutory relief because the doctrine "applies only to parties who seek an equitable remedy from a court").

Turning to the merits of Plaintiff's TPPA claim, Plaintiff contends summary judgment should be granted in her favor because there are no disputes of material fact as to any element of the prima facie claim and Defendants cannot proffer a legitimate non-retaliatory reason for her termination. (Doc. Nos. 50, 51).

Defendants contend they should be granted summary judgment on the TPPA claim because Plaintiff cannot establish required elements of her claim – specifically that: (1) Plaintiff cannot establish that she had a reasonable belief that Dr. Hoover's conduct constituted illegal activity and therefore fails to establish the second element of a prima facie claim; and (2) she cannot establish a claim against Coffee because she did not report the alleged illegal activity to anyone other than Dr. Hoover before she quit. Finally, Defendants proffer non-retaliatory reasons for termination.

1. Prima Facie Case

To establish a prima facie case of retaliatory discharge under the TPPA, the Plaintiff must show: (1) that she was an employee of the defendant; (2) that she refused to participate in or remain silent about "illegal activities" as defined by the statute; (3) she was terminated; and (4) an exclusive causal relationship existed between her refusal to participate in or remain silent about

---

[5] Defendants contend Plaintiff's TPPA claim is barred because she has unclean hands (literally and legally). They argue that by cleaning the dog Plaintiff "actively participat[ed] in (even orchestrat[ed]) a coverup" of the alleged animal abuse and would therefore "have no TPPA claim because she would have participated in the alleged wrongdoing, and such raises a defense of unclean hands." (Doc. No. 55 at 13-14).

illegal activities and her termination. *Williams*, 465 S.W.3d at 113. The burden to establish a prima facie case is not onerous. *Id*.

There appears to be no dispute that Plaintiff has established that she was an employee of Woodbury and of Coffee and was terminated – elements one and three. The parties primarily discuss element four – an exclusive causal relationship – in the context of whether Defendants proffer a legitimate non-retaliatory reason for termination and Plaintiff's ability to show pretext. Given the temporal proximity between Plaintiff's complaints and her termination, and the relatively light burden at the prima facie stage, the Court also considers the causation element of a prima facie case to be satisfied. Defendants challenge Plaintiff's ability to show a reasonable belief that Dr. Hoover engaged in illegal activity and that she reported illegal activity to anyone other than the wrongdoer before her employment at Coffee ended. Both issues are part of element two.

a) *Reasonable Belief in Illegal Activities*

Plaintiff is not required to prove that the actions she complained of or refused to participate in were actually illegal, only that she has cause to believe that illegal conduct had occurred. *King v. Delfasco*, 646 S.W.3d 456, 468 (Tenn. Ct. App. 2021) (citation omitted). To show a reasonable belief of illegal activity, Plaintiff must "'identify the law and policy that [she] contends was contravened and must be able to substantiate these allegations to some degree." *Id.* at 469 (citing *Richmond v. Vanguard Healthcare Servs*., LLC, No. M2014–02461–COA–R3–CV, 2016 WL 373279, at *7 (Tenn. Ct. App. Jan. 29, 2016)).

Plaintiff points to Tennessee's statute prohibiting cruelty to animals – Tenn. Code Ann. §§ 39-14-201 and 202 – and the ethical rules governing veterinarians set forth in Tenn. Code Ann. §§ 62-12-101, *et seq*., and Tenn. Rules and Regs. 1730-01. The Court focuses on the Tennessee statute prohibiting cruelty to animals. Under this statute, a person commits cruelty to animals if he

16

intentionally or knowingly "tortures [or] maims" an animal.[6] Tenn. Code Ann. § 39-14-202(a)(1). "Torture" is defined as "every act, omission, or neglect whereby unreasonable physical pain, suffering, or death is caused or permitted."[7] Tenn. Code Ann. § 39-14-201(4). Reading these provisions together, a person who engages in an act that causes unreasonable physical pain to an animal commits the offense of animal cruelty. Under the statute, the first offense of animal cruelty is a Class A misdemeanor; a second or subsequent offense is a Class E felony. Tenn. Code Ann. § 39-14-202(g).

Defendants argue Plaintiff's belief that Dr. Hoover's conduct toward the dog constituted illegal activity was not reasonable. because she "testified that she did not consider Dr. Hoover to have 'tortured' Luna" and that there was no maiming because Plaintiff "never even saw so much as a mark on Luna." (Doc. No. 44-2 at 23). Defendants conclude that without "torture" or "maiming," it was unreasonable for Plaintiff to believe Dr. Hoover's conduct toward the dog was animal abuse.[8] (Id. at 23-24).

Defendants' reliance on Plaintiff's testimony of her perception of whether Dr. Hoover's conduct constituted "torture" is misplaced. Construing the testimony in the light most favorable to Plaintiff, her testimony that she did not view Dr. Hoover's conduct as "torture" because it was not "prolonged" was based on the common meaning of the word, not the statutory definition. This

---

[6]    The statute contains a number of other provisions concerning treatment of animals, none of which are relevant here.

[7]    Notably, the statutory definition of "torture" encompasses less severe conduct than that encompassed under the ordinary meaning of the word, which is "the infliction of intense pain (as from burning, crushing, or wounding) to punish, coerce, or afford sadistic pleasure" or "something that causes pain or agony." *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/torture (last visited Feb. 21, 2025).

[8]    Defendants also compare Dr. Hoover's conduct to that of "spanking a human child," and argue that because spanking a child "is not illegal nor could reasonably be perceived as such" Plaintiff's belief that Dr. Hoover's actions were illegal was not reasonable.

purported admission by no means establishes the unreasonableness of her belief that Dr. Hoover's conduct was illegal.

Of course, whether Plaintiff's belief that Dr. Hoover's conduct violated laws prohibiting animal abuse was a reasonable belief turns largely on the conduct at issue and on that there are significant disputes of fact. It is undisputed that while assisting Dr. Hoover with treating a dog at Coffee, Plaintiff observed Dr. Hoover "make contact with his hand to Luna's nose twice." (Pl. SOF ¶ 5). The parties disagree on the force of the contact and whether it caused pain.

Plaintiff testified that "Dr. Hoover got upset and struck [Luna] violently on the muzzle twice loud enough that you could hear it throughout the treatment room. And I know it caused her pain because she yelped as if she was in pain and she urinated and defecated on herself, none of which is behavior you would expect from a dog who is not in pain."[9] (Thompson Dep. at 43).

Dr. Hoover, on the other hand, testified that he "tapped [Luna] two times on the nose." (Hoover Dep. at 36; *see also id.* at 48). When asked to describe the strength of the tap, he said, "it's not hard" and "it's a touch." (*Id.* at 35, 36). According to Dr. Hoover, Luna reacted by

---

[9]     Defendants argue that Plaintiff's testimony about the reason the dog yelp is impermissible speculation. (Doc. No. 55 at 6-7). Defendants further argue that "even assuming the dog's purported yelping was an expression of pain, such statement by the dog would be inadmissible hearsay. Plaintiff could not testify that a person 'told me he was in pain.' Likewise, Plaintiff cannot testify that the dog told her it was in pain." (*Id.* at 7). This the first occasion for the Court to consider a hearsay objection concerning a sound made an animal.  If, indeed, Luna's yelp was a "statement" within the meaning of the Federal Rules of Evidence, the Court posits that it might fall within one of the exceptions to the Rule against hearsay – excited utterance, a then-exiting mental, emotional, or physical condition. *See* Fed. R. Evid. 803(2), (3). Or perhaps, given the medical environment, Luna's "statement" was made for medical diagnosis or treatment. *See* Fed. R. Evid. 803(4). The Court need not spend time exploring these delightful avenues because the Rule against hearsay provides that "statements" may be made by a "person." Fed. R. Evid. 801(a), (b).

Defendants' argument that the Court should disregard Plaintiff's testimony that she viewed Luna's yelp as an expression of pain because there is "no showing as to the reason the dog 'yelped'" is somewhat perplexing. Particularly given that Plaintiff clearly contends the dog yelped because Dr. Hoover struck her "violently on the muzzle twice." (*See* Pl. Dep. at 43). Plaintiff's testimony merely explains why she believed the dog was in pain. (*See id.* ("I know it caused her pain because she yelped as if she was in pain")). Is it "pure speculation" for Plaintiff to describe the yelp as one reflecting pain? Given her experience as a veterinary technician, and the circumstances of the incident, the answer is "no."

"look[ing] at [his] finger." (*Id*. at 39). He did not believe Luna urinated on herself and was sure she did not defecate on herself. (*Id*. at 42). Plaintiff argues that Dr. Hoover's text messages to Dr. Bruner, which describe the contact with Luna's nose as a "rap" rather than a "tap," cast doubt on the description provided during his deposition. (*See* Doc. No. 51 at 5). Dr. Hoover says "rap" was a typo. (Hoover Dep. at 32-33).

Needless to say, this underscores the factual dispute concerning the nature of the contact between Dr. Hoover's hand and Luna's muzzle. At the summary judgment stage the Court does not make credibility determinations or decide questions of fact. Construed in the light most favorable to Plaintiff, a jury could conclude that Dr. Hoover violently struck Luna twice, causing her to yelp as if in pain and to urinate and defecate on herself, and thus find Plaintiff's belief that Dr. Hoover committed animal abuse – *i.e.*, inflicting unreasonable physical pain on an animal – was reasonable. But when the testimony is construed in the light most favorable to Defendants, a jury could conclude that Dr. Hoover merely tapped Luna on the nose eliciting no reaction other than her looking at his finger. If that is what happened, her belief that such conduct was animal abuse was almost certainly unreasonable.

Because there are disputes of material fact on this element of Plaintiff's prima facie case, summary judgment cannot be granted in favor of either party based solely on this element.

b)  *Reporting*

Defendants next argue they are entitled to summary judgment on the TPPA claim because Plaintiff did not report the conduct to anyone other than Dr. Hoover "prior to quitting and leaving her shift." (Doc. No. 44-2 at 21). She only reported Dr. Hoover's conduct to Dr. Bruner *after* she left Coffee. Therefore, Defendants argue there can be no retaliatory discharge from Coffee because Plaintiff did not report her concerns to anyone other than the alleged wrongdoer until after her

19

employment at Coffee ended. (*Id*. at 22). Defendants further argue that if Woodbury and Coffee are "unified essentially as a single employer" then Plaintiff necessarily quit Woodbury when she quit Coffee and her reporting to Dr. Bruner was too late to state a claim for retaliation.

Plaintiff disputes that she quit Coffee the moment she left the building. (*See* Doc. No. 58 at 12). In fact, she claims she does not know exactly when her employment with Coffee ended except that she was "forced to leave" sometime after lunch on November 29, 2022. (Pl. Resp. Def. SOF ¶¶ 30, 31 (citing Pl. Dep. at 50)). Plaintiff argues that even if she ended her employment with Coffee *before* she spoke to Dr. Bruner, her claim is based on *both* her opposition to Dr. Hoover's alleged animal abuse by reporting it *and* her refusal to participate in further abuse. (Doc. No. 58 at 13). Plaintiff contends there is no dispute that she was terminated from Woodbury *after* she spoke to Dr. Bruner, therefore her reporting to Dr. Bruner satisfies the reporting requirement with regard to her claim against Woodbury. (*See* Pl. SOF ¶¶ 12, 15).

Her claim against Coffee, on the other hand, is based on refusal to participate in further abuse, which does not require reporting. *See Haynes*, 463 S.W.3d at 37, n.3. Defendants do not address this aspect of her claim.[10] Therefore, summary judgment cannot be granted in favor of Defendants based on Plaintiff's alleged failure to establish she reported the illegal conduct before she was terminated.

As explained above, there are disputes of material fact, including Dr. Bruner's actions toward the dog and whether Plaintiff reasonably believed Dr. Bruner committed animal abuse. For

---

[10]     Defendants acknowledge that Plaintiff's claim is based on refusal to participate, but their arguments in opposition to this claim are limited to the argument that "Plaintiff's belief of animal abuse was an unreasonable belief that the non-existent crime of 'animal abuse' of 'animal abuse' had occurred." (*See* Doc. No. 55 at 5, 16; *See also* Def. SOF ¶ 11 ("You state the only reason You were fired was because You refused to participate in alleged animal abuse and because You reported Your allegations of animal abuse to Dr. Hoover and to Dr. Bruner.")).

purposes of Plaintiff's motion these facts are viewed in the light most favorable to the Defendants. A reasonable jury (or finder of fact) could find that Dr. Hoover gently tapped Luna on the nose and that Plaintiff unreasonably believed that he engaged in animal abuse. Because Plaintiff has not shown the absence of disputes of fact and that no reasonable jury (or finder of fact) could find for the Defendant, Plaintiff's motion for summary judgment must be denied and the Court's consideration of Plaintiff's motion ends here.

For purposes of Defendants' motion, however, the Court views the facts in the light most favorable to Plaintiff. Viewed in this light, Plaintiff has established a prima facie case under the TPPA. Accordingly, the Court proceeds to the next step in the burden shifting framework with regard to Defendants' motion for summary judgment.

2. Legitimate Non-Retaliatory Reason for Termination and Pretext

Under the TPPA, once Plaintiff has established a prima facie claim, the burden shifts to the defendant to "produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the plaintiff's discharge." Tenn. Code Ann. § 50-1-304(f). "The burden on the defendant is one of production and not persuasion." *Id*.

Defendants state that Plaintiff was fired for poor performance, and because she stated that she had some "ethical issues" with one of the owners at Coffee who is also a partner at Woodbury and "walked out during her shift on November 29, 2022." Defendants point to a text message from Dr. Bruner to Dr. Hoover, before the incident with Luna, in which Dr. Bruner expressed his displeasure with Plaintiff's work performance. (*See* Doc. No. 44-2 (citing Doc. No. 44-6)).

Plaintiff argues the proffered reasons fail to satisfy Defendants' burden to show that legitimate non-retaliatory reasons existed for her discharge. First, Plaintiff argues that because she claims to have been constructively discharged from Coffee after she refused to recant her allegation

of animal abuse, Defendants effectively cannot proffer a legitimate non-retaliatory reason for her discharge from Coffee. Second, Plaintiff argues that the fact that she left her shift early cannot serve as legitimate grounds for dismissal because even if they had fired her because she left early, because she did so in refusal to participate in illegal conduct, such termination would "amount to direct evidence of retaliatory motive." (Doc. No. 58 at 18 (citing *Williams v. City of Burns*, 465 S.W.3d 96 (Tenn. 2015)).

Finally, Plaintiff argues even if Dr. Bruner did raise some issues about her performance, Defendants have never asserted (until summary judgment) that they actually fired her for alleged performance issues and that Dr. Bruner's affidavit (Doc. No. 57-1), filed with Defendant's response to Plaintiff's motion for summary judgment, should not be considered.

In the affidavit, Dr. Bruner states that "Plaintiff's lack of attention to her job and lack of skills necessary to perform her job, as evidenced by these said text messages occurring prior to Plaintiff's alleged incident forming the basis of her claim, were one of the reasons she was terminated, and such reasons could not possibly be considered pretext for retaliatory discharge as said text messages occurred prior to the alleged incident in question." (*Id*.). Plaintiff argues the Court should disregard Dr. Bruner's affidavit for a number of reasons, including that it directly contradicts the Termination Letter, sworn interrogatory responses, and deposition testimony. (*See* Pl. Reply, Doc. No. 60 at 2-3). Plaintiff argues that until this affidavit, Defendants never argued that Plaintiff was fired for poor performance, only that she could have been. (*Id*. at 3 (citing Doc. No. 57 at 2) (stating that "reasons already existed for Plaintiff's termination prior to the alleged incident")).

At best, Dr. Bruner's affidavit clarifies prior testimony; at worst, it directly contradict it. For purposes of this motion, the Court need not decide whether the affidavit should be stricken

under the sham affidavit doctrine. *See France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (explaining that under the sham affidavit doctrine, after a motion for summary judgment has been made, a party may not file an affidavit that contradicts his earlier sworn testimony or is an attempt to create a sham fact issue; any such affidavit should be stricken). This is because even if Defendants proffered reasons satisfy Defendants' burden to establish that "legitimate, nondiscriminatory reasons existed for the plaintiff's discharge," Plaintiff easily meets her burden to show the proffered reasons were pretextual. First, close temporal proximity suggests that Plaintiff was constructively discharged from Coffee and fired from Woodbury because she claimed Dr. Hoover engaged in animal abuse. Dr. Hoover immediately told her that if she agreed there was no animal abuse "she could stay and work out the rest of her shift [and] [i]f she didn't agree with that, she was free to go home." (Hoover Dep. at 70). He then texted Dr. Bruner about the incident, "[I]'m done with her." (*See* Doc. No. 44-6). A few days later Plaintiff was also fired from Woodbury. (Pl. SOF ¶ 15).

In light of the foregoing, Defendants' argument that Plaintiff was also fired for poor performance rings hollow. In fact, the first mention of Plaintiff being fired for poor performance appears to come in the form of Dr. Bruner's affidavit attached as an exhibit to Defendants' response to Plaintiff's motion for summary judgment. (Doc. No. 57-1). Even if the Court considered Dr. Bruner's affidavit in support of Defendants' motion for summary judgment (to which it was not an exhibit), Plaintiff has carried her burden to show that the reason given by Defendants was not the true reason for Plaintiff's discharge and that the stated reason was a pretext for unlawful retaliation. Given the chronology of events, including the chronology of the proffered reasons for her termination, a factfinder could conclude that poor performance was not actually a reason for Plaintiff's termination.

## IV.    CONCLUSION

For the reasons stated, the parties' respective motions for summary judgment (Doc. Nos. 44, 50) will be **DENIED**. An appropriate Order will enter.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE